AMY J. LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
SARA D. KALIN (Cal. Bar No. 212156)
Email: kalins@sec.gov
ROBERTO A. TERCERO (Cal. Bar No. 143760)
Email: terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katherine Zoladz, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> ALEX C. PROCOPIO, MARK S. ZOUVAS, and CHRISTIAN R. HANSEN <br><br> Defendants. | Case No. **'20 CV 0182 BEN LL** <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1.     This case concerns a fraudulent scheme by the defendants – Alex C. Procopio, Mark S. Zouvas, and Christian R. Hansen – to reap approximately $75,000 in illicit trading profits by circumventing the registration requirements of the federal securities laws, which govern how stock can be offered and sold to public investors.

COMPLAINT                                               1

2. As part of their scheme, Procopio, Zouvas and Hansen used a two-year-old note issued by a penny stock company called Cuba Beverage Company ("Cuba Beverage"), and then had the note converted into 180 million of shares of Cuba Beverage stock.  Procopio was the chief executive officer of Cuba Beverage at all relevant times; Zouvas was its chief financial officer until 2015, and continued to effectively act in that role at all relevant times; and Hansen is a marketing consultant.

3. Zouvas acquired the convertible note back in December 2014 when he was still the named CFO of Cuba Beverage.  According to Cuba Beverage's 2014 third quarter and annual reports available on the OTC Markets website, Cuba Beverage issued him the note because he had not received any salary or fees for his services since March 2014.  That was not true.  In reality, he had written checks drawn on the Cuba Beverage account to himself, his wife, and an entity he controlled, during that time.

4. The note issued to Zouvas could be converted into Cuba Beverage shares at a price significantly lower than the prevailing market price, allowing the holder of the note to acquire Cuba Beverage shares that could generate substantial profits when sold into the public market.  Zouvas purported to sell Hansen a portion of the note in January 2017.  All three defendants agreed that Hansen would convert the note into shares of Cuba Beverage, sell them in the market, and then kick back a third of the proceeds to each of Zouvas and Procopio.

5. In reality, Hansen provided no consideration to Zouvas at the time Zouvas purportedly sold him a portion of the note.  Instead, the two men agreed that Hansen would pay Zouvas for the note after the Cuba Beverage shares had been sold.

6. Procopio, in his role as the company's CEO, signed off on Hansen's conversion of the note into 180 million shares of Cuba Beverage stock, and then Hansen sold those shares in the public market, splitting the proceeds with Procopio and Zouvas.

7. Under Section 5 of the Securities Act of 1933 ("Securities Act"), sales of

securities to public investors must be registered with the SEC or be exempt from those registration requirements.  Section 5 applies to both a company (or "issuer" of the stock) and its "affiliates," and it is designed to distinguish between securities offerings by the issuers (which require registration) and subsequent trading once the securities have come to rest in the hands of investors (which is generally exempt).  While affiliates of an issuer may resell their securities by registering the sale with the SEC, they can also make the sale without registering it if the sale fits within a "safe harbor" in SEC Rule 144 and satisfies all of the requirements for affiliate sales.  Among other things, this helps make sure insiders and affiliates of a company cannot dump their shares into the market without disclosing the transactions to the public.

8.     For Hansen to be able to immediately sell the Cuba Beverage shares after converting the note, the defendants needed to mislead his broker into believing that the sales complied with the Rule 144 safe harbor.  To do so, the defendants concealed Zouvas' affiliation with Cuba Beverage and its control persons, lied about who would benefit from the sale proceeds, and hid the fact that Hansen had not paid Zouvas for the convertible note.  Having been misled by the defendants, the brokerage firm accepted the Cuba Beverage shares and allowed Hansen to sell the stock into the market, which he did between March and July of 2017 for proceeds of approximately $75,000.  Hansen then split the money among himself, Zouvas, and Procopio.

9.     In deceiving the brokerage firm, the defendants also deceived Cuba Beverage investors.  Brokerage firms are gatekeepers who must take steps to ensure that they do not participate in illegal offerings.  They seek assurances that their customers can rely on a valid exemption before selling unregistered securities into the market.  Here, because the defendants deceived the brokerage firm into allowing Hansen to sell unregistered Cuba Beverage shares, the purchasers of those shares were deprived of the information they otherwise would have been entitled to receive in a registration statement, including information regarding the fact that Cuba

Beverage affiliates were dumping stock.

10.    By this conduct, Procopio, Zouvas, and Hansen violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), and 77q(a)(3); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); and Exchange Act Rules 10b-5(a) and 10b-5(c), 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).  In addition, Defendant Zouvas violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2); and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

11.    With this complaint, the SEC seeks an order permanently enjoining Procopio, Zouvas, and Hansen from future violations of the antifraud provisions of the Securities Act and the Exchange Act, requiring them to pay disgorgement plus prejudgment interest and a civil penalty, and barring them from offering or selling penny stock.  The SEC also seeks an order barring Procopio and Zouvas from acting as officers or directors of public companies.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

13.    Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

14.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants reside in this district.

**THE DEFENDANTS**

15.     **Alex C. Procopio** resides in San Diego, California.  Procopio founded Cuba Beverage in 2007.  At all relevant times, he was Cuba Beverage's president, chief executive officer, secretary, and a director.

16.     **Mark S. Zouvas** resides in San Diego, California.  Zouvas served as Cuba Beverage's CFO, treasurer, and a director from approximately March 2012 to March 2015.  As alleged below, he continued to have an active role in the company at all relevant times, effectively acting as its CFO despite not retaining that title.

17.     **Christian Hansen** resides in San Diego, California.  Since at least 2013, he has run Maximum Performance Advisors Inc. ("Maximum Performance"), a California corporation whose purported business is corporate marketing.

**THE COMPANY**

18.     **Cuba Beverage Company** is a Wyoming corporation with its current principal office in Las Vegas, Nevada.  At all relevant times, it was headquartered in San Diego, California.  Cuba Beverage's stock is quoted on OTC Link ("OTC Link," previously the "Pink Sheets"), which is operated by OTC Markets Group, Inc. ("OTC Markets"), under the ticker symbol "CUBV."  It does not have reporting obligations under Section 13 or Section 15(d) of the Exchange Act.  It purportedly produces and distributes all-natural energy drinks.

**THE ALLEGATIONS**

**A.     Cuba Beverage**

19.     Cuba Beverage is purportedly an energy drink company.  At all relevant times, Procopio was its CEO.  Zouvas was its named CFO until 2015, and continued to act in that role at all relevant times.

20.     The stock of Cuba Beverage is quoted and trades on OTC Link.  Its current stock price is $0.0006, and it has not traded above $0.10 in the last five years.  During the relevant time, Cuba Beverage was part of OTC Link's "OTC Pink" category.  Companies in the OTC Pink category are encouraged to make submissions

to OTC Markets that include all of the information required by the OTC Pink Basic Disclosure Guidelines ("Guidelines").

21.     Cuba Beverage's submissions appeared on Cuba Beverage's public profile on the OTC Markets website (www.otcmarkets.com), which also included, among other things, interactive trading charts, a summary of the company's business, and press releases.

**B.     Zouvas' False Statements in OTC Submissions about Cuba Beverage's Debt Owed Him**

22.     While Zouvas was the named CFO of Cuba Beverage, the company's quarterly report submitted in November 2014 and an annual report submitted in February 2015 each stated that Zouvas was not being paid a salary or fees for his work, and so was owed money by the company.

23.     The quarterly report was for the third quarter of 2014, ended September 30, 2014, and the annual report was for the year ended December 31, 2014.  Each was submitted to OTC Markets and made publicly available on its website.

24.     In both submissions, under "Related Party Transactions," the report stated that Zouvas "has not taken any salaries or fees from the Company since March 31, 2014," and that "[a]s a result, the Company has recorded a related party payable to Mr. Zouvas."

25.     The amount allegedly payable to Zouvas was listed as $25,750 in the quarterly report submitted in November 2014, and was listed as $38,000 in the annual report submitted in February 2015.

26.     In December 2014, Cuba Beverage issued Zouvas the convertible note at issue in this case, purportedly to satisfy this alleged payable.  The note was for $38,000, and included language that allowed future conversion of the note into potentially millions of shares of common stock of Cuba Beverage based on its stock price at the time of conversion.

27.     At the time the 2014 third quarter and annual reports were submitted to

OTC Markets, Zouvas was the named CFO of Cuba Beverage.  As CFO, Zouvas signed a certification under oath stating that he had read the submission and that it did not contain any materially untrue statements.

28.    He prepared, signed, and certified the 2014 third quarter report for the quarter ended September 30, 2014, which was submitted to OTC Markets on or about November 14, 2014.

29.    He also prepared, signed, and certified the 2014 annual report for the year ended December 31, 2014, which was submitted to OTC Markets on or about February 18, 2015.

30.    However, the disclosure in the third quarter and annual reports for 2014 that Zouvas had not taken any salaries or fees from Cuba Beverage since March 31, 2014 was false.

31.    Between April 1, 2014 and December 31, 2014 (the end of Cuba Beverage's fiscal 2014), Zouvas signed company checks totaling about $8,500 that were payable to either himself, his wife, or Magnolia Hill Resources, LLC ("Magnolia Hill") – an entity he controlled.  One of the checks included a notation that the payment was for "CFO partial fee."

32.    Zouvas also signed a Cuba Beverage check to himself for $1,000, and to Magnolia Hill for $200, between January 1, 2015 and February 18, 2015, when Cuba Beverage's 2014 annual report was actually submitted to OTC Markets.

33.    The $8,500 that Zouvas paid himself between April and December 2014 was about 45% of Cuba Beverage's revenues reported during the same time, and as of December 31, 2014, Cuba Beverage reported having $0 in total current assets.

34.    Similarly, the $1,200 he took in the first quarter of 2015 was about 41% of Cuba Beverage's reported revenues of $2,956 during the same period.

35.    Zouvas thus made false and misleading statements in Cuba Beverage's 2014 quarterly and annual reports claiming he had not been paid, when he had.

36.    Zouvas' false and misleading statements were publicly available on OTC

Markets' website while Cuba Beverage stock was being traded and were made in the offer and sale of, and in connection with the purchase or sale of a security.

37.    Zouvas knew, or was reckless or negligent in not knowing, that the statements in the two reports were false because, despite what the reports claimed, he had been receiving money from the company.  As the CFO of the company, Zouvas also did not exercise reasonable care in making these statements in these reports.

38.    Zouvas obtained money by means of this fraud when Cuba Beverage issued him the $38,000 convertible note to satisfy the false debt he claimed to be owed.

39.    A reasonable investor in Cuba Beverage would find it important to know that Zouvas was making undisclosed payments to himself, his wife and his own company, especially since the payments constituted large portions of Cuba Beverage's revenues and assets reported at the time.  A reasonable investor would also want to know that Zouvas was further enriching himself with company shares issuable pursuant to a false payable.

**C.    The Defendants' Scheme to Sell Stock in Circumvention of the Registration Provisions of the Securities Act**

40.    In 2017, Procopio, Zouvas, and Hansen used the $38,000 convertible note issued to Zouvas in 2014 under false pretenses to make approximately $75,000 in profits through a fraudulent scheme to illegally sell unregistered Cuba Beverage stock into the market.

41.    In or around January 2017, Procopio, Zouvas, and Hansen agreed that Zouvas would sell $1,800 of the $38,000 convertible note to Hansen.

42.    Hansen wrote a check for $1,800 to Zouvas, but did not actually use his own money to buy the convertible note.  Instead, Zouvas gave the $1,800 to Hansen with the understanding that Hansen would pay Zouvas back after the shares had been sold.  This created a false record that gave the impression that Hansen had paid for the note in January 2017.

43.     In January 2017, Hansen's portion of the note was converted to 180 million shares of Cuba Beverage shares.  At that time, Cuba Beverage stock was trading at about $0.0001/share.  So for the purported $1,800 purchase price for the note, Hansen obtained about $18,000 worth of stock.

44.     The defendants agreed that Hansen would sell the shares on the open market and split the proceeds three ways—one third to Zouvas, one third to Cuba Beverage's bank account, and one third for himself.  Most of the proceeds that went to the company went to company CEO Procopio, and in fact, one of the payments went directly to Procopio.

### 1.     SEC Registration Requirements and Rule 144

45.     The Securities Act protects investors by ensuring that companies issuing securities fully disclose information relevant to a public offering.  One of the most important aspects of the Securities Act is its registration requirement, which requires issuers to register sales of their securities to public investors.  That requirement is central to protecting public investors, because it is designed to assure that material facts bearing on the value of publicly traded securities is available and disclosed to the investing public.

46.     There are specific exemptions under the Securities Act that allow some offers or sales of securities to be made without registering the sale with the SEC. One of those exemptions is found in Section 4(a)(1) of the Act.  While Section 5 generally requires registration for the flow of securities from an issuer to investors, the premise of the Section 4(a)(1) exemption is that registration is no longer necessary for further sales once the shares come to rest with public investors.

47.     Section 4(a)(1) exempts "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  An underwriter is defined to include anyone who purchased a security from "an issuer with a view to" later "distribut[e]" the security to others, or anyone who "offers or sells" securities "for an issuer" in connection with the distribution of those securities.  For this definition of an

underwriter, an "issuer" is additionally defined to include "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

48.     Rule 144 of the Securities Act creates a "safe harbor" from the underwriter definition for persons seeking to resell stock they acquired directly from an issuer without any registration – often called "restricted securities." A person satisfying the applicable conditions of the Rule 144 safe harbor is deemed not to be an underwriter for purposes of the Section 4(a)(1) registration exemption, and therefore can sell the restricted securities without having to register the sale with the SEC.

49.     There are several requirements under Rule 144 for this safe harbor to apply. One of them is the holding period requirement. Under Rule 144, restricted securities must be held for more than a year before they can be resold again.

50.     Here, the 180 million shares of Cuba Beverage stock were "restricted" securities. That is because Hansen had acquired them from an affiliate (Zouvas) in a transaction (the purported sale of the note to Hansen) that had not been registered with the SEC. However, the shares were not held for more than a year before they were resold.

51.     Hansen was also an underwriter when he resold the stock into the market. He not only acquired his stock from an affiliate with an immediate intent to resell into the market, but he was also selling these shares "for an issuer" or its affiliates because he had agreed to pay back a third of the trading profits to the issuer – Cuba Beverage – as well as to Procopio and Zouvas, who were both affiliates of Cuba Beverage. His sales thus neither qualified for the Section 4(a)(1) exemption nor the Rule 144 safe harbor.

52.     In February 2017, as alleged in more detail below, Hansen submitted a deposit request to his brokerage firm for the 180 million Cuba Beverage shares that had been issued upon conversion of his note. He communicated that he was relying

on the Rule 144 safe harbor to make that sale.

53.    In order to resell the stock and to ensure compliance with the registration requirements of the Securities Act, Hansen's brokerage firm required proof that the Rule 144 safe harbor that Hansen purported to rely on was valid.  Hansen's brokerage firm would not accept the shares without documentation from Procopio and Hansen that Hansen had acquired his shares from someone who was not an affiliate of Cuba Beverage, and that the shares had been held for more than a year.

54.    As alleged below, the defendants deceived the brokerage firm into believing that Hansen had not acquired the shares from an affiliate of Cuba Beverage and that he was not acting as an underwriter by selling them for affiliates of the company.

55.    In addition, Rule 144 provides that the one-year holding period does not begin until the full purchase price is paid by the person acquiring the securities from the issuer or from an affiliate of the issuer.  Because Hansen did not pay the full purchase price for the note to acquire the stock until after he sold the shares into the market, the one-year holding period required for Rule 144's safe harbor to apply never began to run.  And even if Hansen's acquisition of the note was considered a real sale, he did not hold the convertible note or the shares into which it was converted for more than the required year.  In fact, he only held them for about two months before he sold them into the market.

### 2.    Zouvas' Affiliate Status with Cuba Beverage

56.    Under Rule 144, an affiliate is a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."  Control may rest with a group of persons, such as the members of the corporation's management.

57.    From March 2012 through March 2015, Zouvas was Cuba Beverage's CFO.  Although he announced his resignation as CFO in March 2015, his resignation changed nothing with respect to his management control over Cuba Beverage, as he

continued to act as its CFO.

58.     Through 2017, and at all relevant times, Zouvas was an affiliate of Cuba Beverage.  For example, he continued to prepare Cuba Beverage's financial statements and its submissions to OTC Markets through the spring of 2017 because Procopio had no background in accounting or finance and was unable to do them himself.

59.     During 2017, Zouvas reviewed company press releases and was involved in negotiations with potential investors.  He suggested that Procopio use certain language in loan agreements, or refuse to do business with particular investors.

60.     Even though OTC Markets' disclosure guidelines requested the identification of any individual who advised a company or helped prepare its OTC submissions, Zouvas never identified himself as such despite continuously advising Procopio and preparing both the financial statements and the OTC submissions.

### 3.     Defendants' Roles in the Fraudulent Scheme

61.     Procopio, Zouvas, and Hansen each had a role in the fraud related to depositing the Cuba Beverage shares with Hansen's broker.  Procopio and Hansen both lied to the broker in order to make it appear that the sale of the 180 million Cuba Beverage shares was consistent with the requirements of the Rule 144 safe harbor. Zouvas concealed his affiliate status with Cuba Beverage, and facilitated Hansen's lies regarding payment for the convertible note.

####        a.     Procopio

62.     On February 9, 2017, Procopio wrote a letter to Hansen's brokerage firm as the CEO of Cuba Beverage, representing, among other things, that "[t]here is no agreement or other arrangement between [Cuba Beverage] and [Zouvas and Hansen] to remit any portion of the proceeds from the resale of [Cuba Beverage stock] to Cuba Beverage."

63.     This statement was false.  The purpose of the scheme was for Hansen to

split his sales proceeds with Cuba Beverage and Zouvas, with Procopio taking funds from Cuba Beverage's account.

64.     The letter further represented that Zouvas was not an "Affiliate[s] of [Cuba Beverage] as that term is used in paragraph (a) of Rule 144 of the Securities Act of 1933 …."

65.     This was also false.  Procopio knew that Zouvas' duties with respect to Cuba Beverage never changed after he resigned as CFO.  Procopio's representation that Zouvas was not an affiliate was therefore false.

66.     In carrying out this fraud, Procopio knew, or was reckless or negligent in not knowing, that he was deceiving the broker into effectuating resales of unregistered securities, and was misrepresenting and omitting the truth, about Zouvas' affiliation with Cuba Beverage and Zouvas' role in the sale of the converted shares.  As the CEO of the company, Procopio also did not exercise reasonable care in his dealings with his brokerage firm in connection with the deposit and sale of the shares.

### b.     Zouvas

67.     Zouvas actively concealed his affiliation with Cuba Beverage.  By doing so, Zouvas was able to carry out the fraudulent scheme with his co-defendants so they could each profit through the use of his convertible note.

68.     Zouvas took steps to hide his affiliation with, and influence over the company.  For example, on February 24, 2017, Procopio sent Zouvas an email seeking his advice on a press release.  In response, Zouvas stated:  "It looks fine to me – start sending me this stuff through what's app [*sic*] – I don't want to have a record of looking at this kind of thing."

69.     Zouvas also engaged in deceptive conduct when he agreed with Hansen that Hansen did not have to pay him for the convertible note until after the shares were sold.  By doing so, Zouvas created a false record of "proof of payment" that Hansen could show his brokerage firm when the shares were to be deposited and then

1    sold.

2        70.    Zouvas also hid his affiliated status from the investing public.  For

3    example, OTC Markets' disclosure guidelines requested the identification of any

4    individual who advised a company or helped prepare its OTC Markets submissions.

5    Despite this, Zouvas never identified himself after having resigned as CFO even

6    though he was continuously advising Procopio and preparing Cuba Beverage's

7    financial statements and disclosure.

8        71.    In carrying out this fraud, Zouvas knew, or was reckless or negligent in

9    not knowing, that he was concealing his affiliation with Cuba Beverage.

10              **c.    Hansen**

11       72.    On February 3, 2017, Hansen submitted a deposit request for 180 million

12   Cuba Beverage shares to his brokerage firm.

13       73.    In the security depositor agreement within the request, he disclaimed

14   acting in any joint, collaborative, or orchestrated action with any other person.  The

15   same form specifically asked that Hansen confirm that he was not paying or sharing,

16   directly or indirectly, any of the proceeds from the sale of the shares with the issuer

17   or the person from whom he had acquired the shares.

18       74.    In fact, Hansen had an undisclosed agreement to kick back a portion of

19   the proceeds to Procopio (through Cuba Beverage) and Zouvas.  Hansen signed the

20   agreement under penalty of perjury.

21       75.    Hansen also submitted to the brokerage firm a a "Rule 144(b)/Rule

22   144(d)/Section 4(1) Shareholder Representation Letter."  In that letter, he stated that

23   he was not acting in concert with any person for the purpose of selling Cuba

24   Beverage's securities.  That statement was false because of his secret kick-back

25   agreement with Zouvas and Procopio.

26       76.    Furthermore, when one of the brokerage firm representatives asked

27   Hansen to state whether he had ever been involved "in any stock promotion activity

28   for Cuba Beverage or any OTC stocks," Hansen responded by saying, "I have not

COMPLAINT                                    14

been involved in any promotional activities for Cuba Beverage or any other company."

77.  That was also false.  Hansen's company, Maximum Performance, is in the business of corporate marketing.  In 2013, on behalf of his company, Hansen had signed a contract with Cuba Beverage relating to "public relations and corporate communications services," including services like, "Daily Outbound Tele-Campaign to New Investors," and "Postcard Mailers to Existing Shareholders and Target Investors."

78.  In addition, around the same time Hansen stated that he had not done any promotional work for Cuba Beverage or any other company listed on the OTC market, he was providing promotional services for at least one other OTC-listed company.

79.  Hansen further deceived his broker when, in response to the broker's deposit requirements for proof that Hansen had paid Zouvas for the convertible note, Hansen submitted a copy of a check for $1,800 from himself to Zouvas, as well as a copy of a deposit confirmation from Zouvas.

80.  By giving the broker the copies of the check and deposit slip, Hansen gave the brokerage firm the false impression that he had actually paid for the note to acquire the shares.  In reality, however, Zouvas and Hansen had agreed to have Zouvas provide Hansen with the funds to purchase the note with the understanding that Hansen would repay Zouvas once the shares had been sold.  As a result, the check and deposit slip Hansen submitted to his brokerage firm was not proof of an actual payment to Zouvas.

81.  In carrying out this fraud, Hansen knew, or was reckless or negligent in not knowing, that he was deceiving the broker, and was misrepresenting and omitting the truth, about Zouvas' role in the sale of the converted shares or Hansen's agreement with Zouvas regarding the note and the shares.  Hansen also did not exercise reasonable care in his dealings with his brokerage firm in connection with

the deposit and sale of the shares.

**4.     The Sale of the Shares and Splitting of Profits**

82.     From March 7 to April 11, 2017, Hansen sold 105 million shares of Cuba Beverage to the public for proceeds of about $43,000.

83.     On April 17, 2017, he wired $30,000 from his brokerage account to his bank account, and on the same day gave a check for $10,000 to Cuba Beverage and a check for $10,000 to Zouvas.

84.     Procopio deposited the check to Cuba Beverage into Cuba Beverage's bank account on the same day, and then used the money in the account to pay for some business expenses, as well as his personal expenses, including grocery store, car wash, restaurant and travel costs, along with cash withdrawals.

85.     Between April 24, 2017 and July 12, 2017, Hansen sold his remaining 75,000,000 shares for additional proceeds of approximately $33,000.

86.     On July 13, 2017, he wrote a $3,000 check to each of Cuba Beverage and Magnolia Hill.  Hansen also wrote a separate $1,800 check to Zouvas.  Hansen and Procopio met in person to exchange the checks, and Procopio later delivered Zouvas' two checks to him in person.

87.     On July 19, 2017, when the last Cuba Beverage sales had settled, the three defendants repeated the process, but this time, Hansen wrote a check directly to Procopio instead of Cuba Beverage.

88.     In total, Hansen sold about $75,000 worth of Cuba Beverage stock, and paid Zouvas and Procopio (either directly or through Cuba Beverage) approximately $20,000 each.  While the $40,000 he paid them was not actually two thirds of the trading proceeds, Hansen told them that the total trading proceeds were approximately $54,000.

89.     The defendants carried out this fraud in connection with the purchase and sale, and in the offer and sale, of the converted shares into the public market.

90.     In light of the responsibilities placed on brokers to ensure that they do

not make illegal sales of securities for their customers, any reasonable broker would have wanted to know the truth about the defendants' agreement to sell the shares without complying with the Rule 144 safe harbor, about Zouvas' affiliation with the company, and about his arrangement with Hansen and Procopio to sell the stock into the public market and share the profit amongst the three of them. That information would have alerted the broker that he was selling for an underwriter in a nonexempt, unregistered distribution.

91.    Any reasonable Cuba Beverage investor would have wanted to know the truth about the company's CEO (Procopio) and acting CFO (Zouvas), being involved in a scheme to sell unregistered shares on the open market without satisfying the requirements of Rule 144.

**D.    Lack of Registration of the Sale of Cuba Beverage Stock**

92.    The defendants' offer and sale of the 180 million shares of Cuba Beverage stock from March to July 2017 was not registered with the SEC.

93.    No registration statement was ever filed with the SEC for the offer or sale of those shares.

94.    Hansen directly sold the Cuba Beverage shares without registration because he acquired the portion of the convertible note that was then converted into the Cuba Beverage shares, he deposited those securities with his broker, and his broker thereafter sold them to the public at Hansen's instruction.

95.    Hansen was an underwriter. When he acquired the note and converted it into shares of Cuba Beverage stock, Hansen acquired the shares with a view to sell those securities into the market. He also sold those shares for the issuer, as evidenced by his remittance of a portion of the sale proceeds back to the issuer, Cuba Beverage, and its affiliates.

96.    Procopio was a necessary participant and substantial factor in Hansen's offers and sales of the Cuba Beverage shares of stock. As CEO of Cuba Beverage, he authorized the issuance of the shares upon conversion of Zouvas' note, and signed the

necessary paperwork for the broker to accept Hansen's shares for deposit.  Without Procopio's participation as the CEO of the company, Hansen's brokerage firm would not have been deceived that the shares were exempt under Rule 144, and would not have allowed Hansen to sell the shares into the market.  Moreover, Procopio helped plan the scheme and received proceeds from the illegal stock sales.

97.     Zouvas was also a necessary participant and substantial factor in Hansen's offer and sale of the Cuba Beverage shares of stock.  Zouvas concealed his affiliation with CUBV, and provided Hansen the $1,800 needed to buy the note that was converted into the stock.  But for Zouvas' alleged sale of a portion of his convertible note to Hansen, the shares would not have been issued or sold into the market.  In addition, Zouvas planned the scheme to sell the shares and received proceeds from the unregistered sales.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendants Procopio, Zouvas, and Hansen)**

98.     The SEC realleges and incorporates by reference paragraphs 1 through 97 above.

99.     As alleged above, Procopio, Zouvas, and Hansen engaged in a fraudulent scheme that allowed them to quickly and cheaply profit from the sale of 180 million Cuba Beverage shares without registering the sale of those shares as required by the federal securities laws.  In particular, and as alleged in more detail above, Zouvas concealed his affiliation with Cuba Beverage, Hansen and Procopio lied to the broker to facilitate the deposit of the shares, and Hansen sold the shares and kicked back a portion of the proceeds to Procopio and Zouvas.

100.   By engaging in the conduct described above, defendants Procopio, Zouvas, and Hansen, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate

commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

101.   Defendants Procopio, Zouvas, and Hansen, and each of them, knew, or was reckless in not knowing, that he employed devices, schemes or artifices to defraud and engaged in acts, practices, or courses of business that operated as a fraud upon other persons by the conduct described in detail above.

102.   By engaging in the conduct described above, defendants Procopio, Zouvas, and Hansen, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Violations of Sections 17(a)(1) and (3) of the Securities Act
### (against Defendants Procopio, Zouvas, and Hansen)

103.   The SEC realleges and incorporates by reference paragraphs 1 through 97 above.

104.   As alleged above, Procopio, Zouvas, and Hansen engaged in a fraudulent scheme that allowed them to quickly and cheaply profit from the sale of 180 million Cuba Beverage shares.  In particular, and as alleged in more detail above, Zouvas concealed his affiliation with Cuba Beverage, Hansen and Procopio lied to the broker to facilitate the deposit of the shares, and Hansen sold the shares and kicked back a portion of the proceeds to Procopio and Zouvas.

105.   By engaging in the conduct described above, defendants Procopio, Zouvas, and Hansen, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or

courses of business which operated or would operate as a fraud or deceit upon the purchaser.

106. Defendants Procopio, Zouvas, and Hansen, and each of them, knew, or was reckless or negligent in not knowing, that he employed devices, schemes or artifices to defraud and engaged in acts, practices, or courses of business that operated as a fraud upon other persons by the conduct described in detail above.

107. By engaging in the conduct described above, defendants Hansen, Procopio and Zouvas, and each of them, violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), and 77q(a)(3).

## THIRD CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (against Defendant Zouvas)

108. The SEC realleges and incorporates by reference paragraphs 1 through 97 above.

109. In two publicly available reports submitted to OTC Markets, Zouvas made materially false and misleading statements to investors and prospective investors, as well as to OTC Markets, by stating that he had received no salary or fees from Cuba Beverage since March 2014, when, in fact, he had received money from the company.

110. By engaging in the conduct described above, defendant Zouvas, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111. Defendant Zouvas knew, or was reckless in not knowing, that he made

untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.   By engaging in the conduct described above, defendant Zouvas violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendant Zouvas)

113.   The SEC realleges and incorporates by reference paragraphs 1 through 97 above.

114.   In two publicly available reports submitted to OTC Markets, Zouvas obtained money by means of materially false and misleading statements to investors and prospective investors, as well as to OTC Markets, by stating that he had received no salary or fees from Cuba Beverage since March 2014, when, in fact, he had received money from the company.

115.   By engaging in the conduct described above, defendant Zouvas, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116.   Defendant Zouvas knew, or was reckless or negligent in not knowing, that he obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.   By engaging in the conduct described above, defendant Zouvas violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### FIFTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against Defendants Procopio, Zouvas, and Hansen)**

118.   The SEC realleges and incorporates by reference paragraphs 1 through 97 above.

119.   As alleged above, Hansen's sale of 180 million Cuba Beverage shares was not registered with the SEC, and no exemption to the registration requirements was available.  Procopio and Zouvas were necessary participants and substantial factors in Hansen's unregistered sale.  For example, Procopio authorized the issuance of the shares to Hansen, and Zouvas sold a portion of his convertible note to Hansen.  In addition, both men were involved in planning the scheme, and both men received proceeds from Hansen's unregistered stock sales.

120.   By engaging in the conduct described above, defendants Procopio, Zouvas, and Hansen, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means of instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

121.   By engaging in the conduct described above, Defendants Hansen, Procopio, and Zouvas, violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

# **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Procopio, Zouvas, and Hansen and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## III.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## IV.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Enter an order against Defendants Procopio and Zouvas pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2), prohibiting them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d).

## VI.

Enter an order against Defendants Procopio, Zouvas, and Hansen prohibiting them from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  January 29, 2020

*/s/ Sara D. Kalin*
Sara D. Kalin
Attorney for Plaintiff
Securities and Exchange Commission